Defendant Account. Arguing on behalf of the defendant's account, Mr. Jeffrey A. Goodwill. Arguing on behalf of the plaintiff's attorney, Ms. Chrysia W. Preston. Thank you, Mr. Goodwill. You may proceed. Good morning, Your Honor. I'm here to make police report. Again, my name is Jeff Goodwill and I represent the defendant, appellant, the Board of Trustees of the Libertyville Police Pension Fund Counsel. Article 3, sections 115 and 116 of the pension code in part address a disabled police officer in annual examinations. It provides that if based upon a medical examination, a disabled police officer is found to have recovered from that disability, the pension board can terminate the disability pension and certify that matter to the chief of police. So the pension board set up an annual examination. I think we're aware of the facts of the case. We're reviewing the police decision. On administrative review, the reviewing court reviews the pension board's decision. And it's reviewed under the manifest weight of the evidence standard, correct? That's correct, Your Honor. That being defined as in order for a fine to be against the manifest weight of the evidence, an opposite conclusion would have to be clearly apparent. Is that correct? I would agree with that. And I would also add that in addition to that, that the reviewing court would have to conclude that all reasonable persons draw on all inferences in favor of the pension board would have to conclude that the opposite conclusion is clearly evident and that the pension board made a mistake. That's the full standard. So it's an extremely deferential standard. It's a pretty high hurdle, is it not? Yes, it is, Your Honor. Okay. That's correct. But the board relied on the opinion of one doctor, correct? Because all the other doctors, well, the only one that testified at this hearing was Chams. But all the prior reports said that the plaintiff was disabled, correct? So that's correct. The three original doctors who examined the plaintiff in 2006 concluded that he was disabled based on his left knee symptomology. There was another examination in 2010 that was an annual. In 2011, that was also another annual. Both those doctors concluded that the plaintiff remained disabled at that time. And then there was an examination in 2015 by Dr. Primus. It was with that examination that Dr. Primus concluded, based on his examination and review of the records, that the plaintiff had recovered from his left knee disability. I realize you can rely on one doctor, but opposing counsel points out some of the issues with this doctor's opinion. First of all, did the doctor improperly reevaluate the original disability finding? No. No. The doctor accepted the fact that the plaintiff was disabled. There was testimony to that fact during the evidence deposition where I specifically asked the doctor, do you understand that it was your job to not determine whether he was originally disabled, but to accept that as fact, and to make the determination as to whether he had recovered from disability? And that's important based on the Hoffman v. Orland Fire Protection District firefighters pension board case, because you can't terminate a disability based on the finding that the person was never disabled to begin with. And Dr. Primus testified, yes, I understand that. I accept that as a fact that he was disabled when the pension board awarded the disability. And I'm making a decision now, it will now be in 2015, based on my examination and review of all the records up to that date, that he had since recovered from that disability. That was Dr. Primus' opinion. That was Dr. Primus' testimony. That's what the pension board relied on, in part, when it terminated the disability pension based on the finding of recovery. Counsel, there's evidence presented on both sides. There's conflicting evidence here. Let's hone in on the critical issue. Tell us specifically why the board's finding should be upheld. What is it about this case that would justify upholding the board's decision based on the standard of review? The Supreme Court of Illinois says there has to be some evidence in the record to support the pension board's decision. And there's substantial evidence in the record that supports the pension board's decision. And that would be what? That's the report and the testimony of Dr. Primus, who's a board-certified orthopedic surgeon with a sub-specialty in sports medicine, who treats shoulders as well as knees, and is admitted into six hospitals in this state. Has admitted privileges at six hospitals. And they've got ostensibly qualified experts on their side. But what I want to ask you, does the board have some credibility issues? Without question. And what was that based on? So, I would say this, that in all the disability restoration cases I've ever been involved in, I've never seen one that implicates credibility the way that this case does. And credibility, there was an issue with credibility from the very beginning. I, as counsel for the pension board, sent an affidavit to the plaintiff to fill out prior to setting up the annual examination. And one of the questions on that affidavit was, have you ever participated in a sports or athletic competition since the pension board awarded you a disability pension? He completed the affidavit. He signed it. Signed that it was true and complete. And he said, yes, I participated in two 5K walks, and I don't know when or where they took place. Now, that is unequivocally, categorically, not true. It's a lie. So, from the very beginning of this case, the plaintiff's credibility... Why is it a lie? Well, it's not true. He participated in jiu-jitsu. He participated in athletic competition since the pension board awarded him a disability pension in 2007. So, between 2012 and 2014, the plaintiff competed in international Brazilian jiu-jitsu federation international competitions in both Chicago and California. Not only did he compete, he actually won one of those competitions. So, the record is replete with evidence with respect to the plaintiff's participation in jiu-jitsu. So, that goes completely counter to what the plaintiff, as the affiant, averred to in his affidavit. Is there any evidence in the record? You know, we don't want to do something and take judicial notice of the nature of jiu-jitsu, but I think all of us probably have some familiarity with the nature of the jiu-jitsu competition. But can you represent, based on the record, how this would work against the claimant and the idea of how physically strenuous is this? How does this tie into the disability issue? Are you certifying him as an expert in jiu-jitsu? No, that's why I'm asking because I figured, you know, it would be enlightening for all of us. But I don't want to go on my knowledge of having viewed it. But what is the nature of it that would indicate that he could be involved in doing his job as a police officer? Well, he testified that jiu-jitsu involves grappling, that jiu-jitsu can involve loss of consciousness, that jiu-jitsu can involve choking, that jiu-jitsu can involve what are called mounts. Jiu-jitsu can involve moves. The moves to earn points in jiu-jitsu to win are called knee on belly. They're called guard pass. They're called mounts. They're called takedowns. And they're called sweeps. So it can be physically strenuous. It can be physically strenuous. And I would say this, that the plaintiff, the last time in the record that we have him participate in some sort of jiu-jitsu function is December 2014, where we have surveillance of him participating in this, let's call it, jiu-jitsu symposium. Did his peer surveillance guy get thrown out of the competition? That's when he got booted out. That's correct. But he was stretching. He saw him stretching, correct? He saw him doing more than just stretching. It's like a yoga move, like a pigeon. And he had the foot in the front of him and he was laying down. That's what he saw him doing, correct? That's what he saw him doing. And that's critical because the plaintiff's testimony, which, again, has already been called into question because he lied on the affidavit, was that he could bend his knee enough to walk and to sit down. But in December 2014, we have an independent witness observing him doing something much more than that. I mean, he has his left knee bent completely under his body with his right leg extended back behind him, and then he switches his legs and puts his right knee completely bent under his body with his left leg bent back behind him. That's a credibility problem. Let's talk about credibility. You have the same pension board who some, how many years ago, in 2006, 2007, had three physicians, independent medical examinations, that said this man was not, every independent medical examination at that time said he was disabled. How did the pension board rule? The pension board granted him a non-duty disability pension and denied a non-duty disability pension. Right. And the trial court reversed. Trial court reversed, and the appellate court affirmed the trial court's decision. Right. So you have three independent medical examiners, doctors, saying board certified blah, blah, blah, just as you said about this previous, who didn't take the advice of the doctors, didn't take the recommendation of the doctors because they had some other opinions, correct? I disagree with that. The pension board took the advice of the doctors and concluded, accepted the doctors' opinions that he's disabled and granted him a non-duty disability pension. They said he was, it was on duty, it was a long-term disability. That's what they said. That's not correct. The pension board at the time determined that he was disabled. There's a non-duty disability pension, 50% salary in the line of duty, 65%. The line of duty has to result from the performance of an active duty. The pension board said, we agree with the doctors that he's disabled based on his left knee pathology at that time. We don't agree with how it occurred. And they got reversed. Right, right. So, I mean, so I'm just grappling with this, you're talking credibility, you know, it makes one sit back and wonder, you know, who do you believe? Or what does this pension board want to believe with respect to this guy? They started having him follow when? Back in the fall or in the summer, in the fall, and then they never came forward with this request for several months later, many months later. In terms of doing surveillance? They surveilled him for how long? It was quite an extensive period of time. Quite an extensive period of time. But the pension board followed its protocol, which is I go to the pension board and say, do we have individuals who are under 50 who are subject to examination? Yes, we do. I was hired by the board, I think, in late 2012. My first meeting was in 2013. So I can't comment on what the board necessarily did prior to that. So I think that in the summer of 2013, we started talking about annual examinations. My client says to me, we're having other police officers come up to us and say, Mr. Anderson is posting things on Facebook about participating in jiu-jitsu. Is this in the record? It is in the record. I don't want your experience. Well, my experience is not. But I'm explaining why we did the surveillance. We followed the Polk case, which is you're not allowed to do an investigation, pension board. Give it over to me and give us the authority to hire somebody to perform surveillance. And that's what we did. And then we relied on Investigator Lang, who said he went out several occasions, didn't see anything. But then Investigator Lang came back and said, Mr. Anderson has posted on Facebook that he's going to be attending a jiu-jitsu seminar in December 2014. And so we said, okay, go, surveil him. See what he's doing. Maybe he's not doing anything. Maybe he's doing something that's inconsistent with his disability, and it turns out he did something that was inconsistent with his testimony and his claimed disability. And is that what Dr. Primus relied upon? Did he rely upon what was told to him by this investigator? Or did he rely upon the medical reports? Did he review the medical reports of the other three independent medical examiners? He didn't give much credibility to Dr. Chams, apparently. Or did he rely heavily on this investigation? Dr. Primus' testimony is that he did rely to some extent on the records that were provided to him with respect to surveillance. So we provide all the medical records from the beginning of treatment up until the date of the examination that we have, as well as the surveillance reports. He reviewed all of that in reaching his conclusion. Dr. Primus, at the end of the day, said, look, the case for me, my opinion didn't turn exclusively on the participation in jiu-jitsu or not participating in jiu-jitsu. He said what was more important to me was my physical examination that I conducted of the plaintiff in 2015, which showed that there was a highly functional range of motion, which he testified that somebody who was a high-end athlete could have that range of motion to perform. He testified to the fact that there was no dystrophy in the legs. Remember, in 2006, during the FCE, or the functional capacity evaluation, it concluded that there was loss of strength and dystrophy. Dr. Primus says this man has extremely strong legs now. Their legs are somebody who is doing something who is leading a very active lifestyle. Then he also said the only objective finding that I could find with respect to anything was very mild pain on the lateral side of the left knee. That was it. I asked Dr. Primus, well, does that finding of mild pain on the lateral side of the left knee support your conclusion that he's recovered from disability? He says, yes, it does. Somebody with that sort of mild pain on the lateral side of the left knee should be able or had recovered from disability and should be able to perform the job of a police officer. That was his testimony. He was still bone on bone. He's still bone on bone. Dr. Primus addressed that as well, and most importantly, as did the treating physician, Dr. Champs. So, yes, there is advanced osteoarthritis in one of the three compartments of the left knee, the lateral compartment. Nobody disputes that it's there. But both Dr. Primus and Dr. Champs testified and said this. The fact that there's degenerative arthritis in the knee is not dispositive of the issue of disability. It's the symptoms that are caused by that. Lack of range of motion, pain, and lack of strength. That's the issue. So Dr. Primus and Dr. Champs said a person can have severe osteoarthritis, objective osteoarthritis in their knee, but have no symptoms and be perfectly fine. And vice versa, somebody can have very minimal osteoarthritis in their left knee and have severe symptoms. So it's not the presence alone of bone on bone osteoarthritis. I concede that. It's in the record. Everybody agrees to it. The issue involves the symptoms. And without question, the symptoms of the plaintiff from 2006 to 2015 changed. They improved substantially, substantially relative to what they were in 2006. Well, how do you distinguish the Bowling v. Murfreesboro firefighters case? I mean, that case basically says if you're returning to a highly physical, demanding job, in that case of firefighting, nobody says that you have to, you know, stop your, you know, somewhat full life and stop any recreational activities. Doing recreational activities versus doing the high-demanding police job are two different things. Isn't that what Murfreesboro says, basically? May I finish? So I agree that that's one part of the holding in the Bowling v. Murfreesboro case. The more important aspect of that case is this. This was an original disability claim, not a restoration. There were six doctors. Five doctors said disabled. One doctor said not disabled. However, the person has a permanent partial disability. And the pension board went with that one doctor, right, who said he has a permanent partial disability to find that he's not disabled. And the court rightfully so said, we're not rubber stamps. This is against the manifest way of the evidence. And part of the evidence in that case is that the person was doing some sort of extracurricular activity. And the court didn't say that the extracurricular activity is not relevant. They said it's not relevant in the Bowling case because all the doctors were aware of it. And none of the doctors said that this was something that was counter to the person's disability. Whereas here, jujitsu is relevant. Dr. Primus looked at it and said, you know, he's doing something that's inconsistent with his disability in his treating position. Dr. Primus said that too. Dr. Primus, or excuse me, Dr. Champ says he has sedentary restrictions. And then Dr. Champ went on to say, yeah, but jujitsu, I'm aware that he's doing it, but it's not a sedentary activity. So I disagree to say that any extracurricular activity is not relevant. It can certainly be relevant. It depends on what the doctor's, what their opinion is after looking at everything. Dr. Primus looked at everything and rather than an opinion that the plaintiff had recovered from his disability, I would argue that the pension board's decision is not against the manifest way of the evidence. I have one other issue. I'll just defer to that. Dr. Champ said that competing in jujitsu wouldn't affect. He knew he was competing in jujitsu. Or he knew he was involved in jujitsu. I'll say this, Justice Berger. We deposed Dr. Champ. The very first mention of jujitsu in any of Dr. Champ's treatment records, I believe, occurred in September of 2016. And that was after the plaintiff had already had two restoration hearings where it was very clear that jujitsu was becoming an issue. There was no records to jujitsu between 2006 and 2016 until the pension board started holding hearings in this matter. Then all of a sudden jujitsu shows up. And Dr. Champ says. It wasn't in any of the Champ's medical reports before that. Before that it was not in there. And Dr. Champ says, well, I'm aware of it, but I don't know when I became aware of it. Let me just ask one more quick question, then we'll get to the other counsel. How are we to take this testimony from Primus about being swayed toward the payer? I can answer that for your honor. So he did use the word swayed. And when I had a chance to redirect Dr. Primus, I went right to that issue. And so his testimony is there. And I said, you know, Dr. Primus, you used this word swayed toward the payer. What did you mean? And he said, by saying swayed, I didn't mean that I was swayed toward or in favor of the payer. What he said is that most of my IMEs come through the employer, which is not uncommon. That's where most of the referrals come from. And he testified on page 1246 of the record. He said what he was talking about was the volume of the work that he gets in terms of IMEs and medical examinations come from the employer. And he said, quote, but the opinions are completely independent and not in any way influenced by who is offering the medical evaluation. So I think that Dr. Primus specifically, you know, he addressed that issue and clarified his use of that word swayed. All right. Thank you, Mr. Goodenow. We will have time for one more. Thank you very much. Ms. Ressler, you may proceed. Good morning, Justices. Mr. Goodenow, may I please record my name is Krisha Ressler on behalf of the plaintiff, Stephen Anderson. We're here today to respectfully request that the appellate court find that the pension board's decision in terminating Anderson's line-of-duty disability is against the manifest way to the evidence. Just briefly, you've touched on this before, but in 2009, the appellate court affirmed the circuit court's award of a line-of-duty disability pension based on two of the work disability duties. One was in 2004 and one was in 2005. The first one in 2004 was Anderson's first injury. Dr. Chams performed a left knee arthroscopy and partial lateral meniscectomy. Let me ask you this. Yes. Section 115 allows for this yearly exam, correct? Correct. In this case, are you arguing that this yearly exam in your client's case is really moot because of the earlier opinions? No, I'm not saying that it's moot. Are you arguing that he could never recover from this because it's bone-on-bone, degenerative, and the doctors testified that this condition wouldn't improve? Well, when you put it that way, I believe that the pension board does have a right to have an IME be examined every year. They have a right to do it, but I'm just talking about the right to do it. It isn't necessarily moot. If we have any situation where a person has a degenerative condition. Well, in this situation with Mr. Anderson, he does have a bone-on-bone. And there was all five doctors, the four IMEs and Dr. Chams, all saying that this is a permanent injury and that based on this bone-on-bone, even when he does get a total knee replacement, he wouldn't be able to return as a police officer based on this disability. And Chams said in his deposition that he was going to have to have an IME replacement because he has severe osteoarthritis. I mean, they're just spinning their wheels is what I'm saying. I mean, there's no way with this record that they could ever find, anybody could ever find him in your argument to have improved to the point where he could be a police officer. Based on what the doctors have stated, yes. And it's kind of clear because in 2012, 2013, and 2014, they didn't have Mr. Anderson go see an IME. They completely disregarded him to go see him until they found Dr. Primus to have him undergo an IME with him. Well, your opponent says that the reason that they went to get an IME in 2015 is because people were complaining that they had seen this man doing jiu-jitsu online. Right. And that's what prompted this. Yes. And Mr. Anderson was on Facebook and he was posting on social media as to his participation in jiu-jitsu. And they did follow him for about nine months. They had 12 minutes of video and of none of that did they find that he was undergoing any manual labor for within, not within his restrictions for his landscaping company and jiu-jitsu. The whole relation of jiu-jitsu based on his police work is completely differential. Being in jiu-jitsu, you're on a flat surface. You are, if you're competing, you're with someone of the same size, same age, and you have a referee. And he stated on Mr. Anderson's day, whenever he gets on the mat, he sits down so his knees and his legs are not harnessed. But the board didn't necessarily believe him. No, they didn't. They called his testimony shifty. They did call it shifty. But yet there was nothing else in the record to say otherwise. No, but I mean, the board is looking at him. We're not looking at him. We have a standard of review that we have to follow. We're not going to have testimony from your client or anybody else. We read the record, we see what the board said, and we have to give deference to their factual findings. We do not. And one of their factual findings, of course, is credibility. Right, and based on our Mr. Anderson, he was credible when he was in. We can't do that. The law is well settled that the credibility determination and the weight to be given to the evidence is up to the board. The law is clear. We can't substitute our judgment for that of the board on credibility and weight issues. Now, that's foreign book law well settled, is it not? Correct. But performing in jiu-jitsu and whether he has a bone-on-bone need is two different things. Performing in jiu-jitsu is just like bowling where they had video of him doing river rafting and stated because he's doing this, he must be able to be a firefighter. Performing in jiu-jitsu is not comparable to a police officer. I don't think any – hopefully the board would never say just because someone does X, they can do Y. But, I mean, you would agree that it's some evidence of functionality, would you not? I mean, it's some evidence. We have certain things that the doctors look at. One is strength. One is range of motion and pain. Those are basically the three things. And functionality is part of that. What can this person do? The investigator watched him walk around, didn't see him well. That's another thing that the board could look at. I mean, functionality as it relates to range of motion, strength, and pain. We have testimony on the record before the board of good range of motion, good strength, and pain, which is completely subjective, which apparently the board didn't believe. So, I mean, you would agree that jiu-jitsu is some evidence of being able to function. Mr. Anderson was a very active person to begin with, just as in Bowling. Mr. Anderson participated in many triathlons, and before he was injured in 2004, that's all he did. That's one of the reasons why the police pension didn't believe him in the first place, based on the 2004 and 2005 injuries, is because he was so active in triathletes. So here is a man who wants to protect his family, get into self-defense, get into protecting his family, and keeping his weight down, because the last IME in 2011, he stated, you need to get your weight down, because if you keep this up, the extra weight on your knee is going to create an impairment that you're going to have to get a total knee replacement before 50. And his whole gear was to try to keep the weight off before he reaches 50. So being in jiu-jitsu and attempting to be part of bonding with his son, who you see in the media and the Facebook is that, you know, he was doing this with his son, I don't believe that this is related to police work. I mean, they say that, Dr. Prima stated, oh, an athlete can go and play if they have a total knee replacement. Well, an athlete is completely different than a police officer. A police officer has suspects that go after someone and is not playing by the rules, so to speak. There's no referee. There's no time limit on when a suspect has to fight a police officer. They're not in as good shape as an athlete is either. Correct. No disrespected police officers. No, but you have to take those elements into consideration when deciding whether a police officer can return and has recovered into a full disability without restrictions. Dr. Primus didn't state that he could return without restrictions. He did say that he could return without restrictions, yes, but within his deposition, he stated that I would recommend someone with a bone-on-bone osteoarthritis to do low-impact activities. That includes biking and elliptical. And there was a whole thing in the media, in his Facebook, about how he was biking. That's not within his restrictions. Let me ask you this question. The doctor, it seems to me, continued to say in his deposition, I believe it was in his deposition, it might have been at the hearing, that this is a preexisting condition. Does that matter that it's a preexisting condition? Yes, that was one of the arguments that we made based on Hoffman. It didn't show that he ever recovered from his disability. It just showed that this disability was created back before 2004. He completely disregards the 2005 disability and states that it was only the right shoulder and right knee, where the whole record states that because he bashed the door down with his right shoulder and right knee, his left leg became more injured. He clarified in his testimony that he relied on the 2005 injury, though. You're arguing the report, not his testimony? Right. Okay. Right. And that's basically what, I mean, everything was based on the report at first, stating that, yes, he can return as a full, unrestricted police officer. But he makes a couple of arguments, stating, no, I wouldn't recommend him to run, but he can run. And, no, I wouldn't recommend him to do high activities, but only low activities, but he can return as a police officer. Those are conflicting opinions based on an IME that shouldn't be happening if you're going to find someone that has recovered from their disability to return as a police officer without restrictions. You know, the last surgery Dr. Chams did in 2006 for Mr. Anderson, he considered this a brutal operation. It was to break the bone and replace it with plates and screws to take the pressure off it. This was an attempt to avoid total knee replacement because he was so young at the time. Even Dr. Primus agrees that there's nothing that can alleviate osteoarthritis. I mean, he's going to have this his whole entire life. That operation certainly could have led to, and did lead to, a loss of range of motion, a loss of strength, which could have been rebuilt through time and exercise, correct? It was. It was, but it was still, everything was still stated in the objective x-rays. They still had bone on bone. This was his type of trying to keep the weight off, trying to strengthen that knee to make it to 50 years old. That was his, and that's what he talks about. Are all people who are police officers, firefighters, whatever, who have to do these types of jobs, who have bone on bone arthritis in their knee and one part of their knee disabled? I'm going to, and this was a topic that was brought up with Dr. Primus as well. All the IMEs that saw Mr. Anderson stated, if you get total knee replacement, you cannot return as a police officer. And that was one of the things that Dr. Primus never stated yes or no because he stated, well, if that's what happens with a police officer or firefighter, if they do, then okay, but I'm not, I don't know. Because he doesn't see a lot of police officers as he testified to. I mean, Dr. Chams, they just found Dr. Chams not credible based on what. Because he was his treater. Because he was his treater and because what Mr. Anderson stated. But what's interesting is that the pension board takes in consideration Dr. Primus' examination of Anderson and finds that credible. But whenever Anderson is treated or examined by Dr. Chams, they find whatever Dr. Chams finds in his examination not credible. That's what I think the court may be struggling with and that is that this is a total mixed bag. You've got all kinds of problems on both sides of this case. And if you have total problems and mixed bag on both sides of the case, how do we not go along with the standard of review? Well, the standard of review is manifest weight as we've all agreed to. It's deference to the board on factual findings. I mean, that's the standard of review. Right. But when you look at the Wade case versus the city of North Chicago, they, Dr. Primus and Dr. Milgram are almost one in the same. Dr. Primus disregards half the medical evidence, disregards the x-ray, doesn't find what Mr. Anderson says true. Almost like, well, he can do this, he should be motivated to do this. Same as Dr. Milgram. Dr. Milgram didn't notice or didn't selectively disregarded some of the evidence that was provided to Wade. He didn't recognize that there was a pop in the medical records. He stated that, Dr. Milgram stated that, well, Wade, if he's so motivated to, he could return as a police officer. Interesting enough, he also suffered from a degenerative knee. And the Supreme Court stated, no, that can't be because this doctor, even though some of his statements were correct, the majority is he disregarded all of the evidence and just selectively picked and chose what he wanted to use to find that he wasn't disabled. This is the same as here. I feel that Dr. Primus is picking and choosing what he wants to see. How old is your client? He's in the mid-upper 40s. So when he was first given the osteotomy, he was in his 30s. And once he turns 50, there are no more IMEs. No more IMEs. And that is also the time that he can actually get his knee replacement as well. The whole thing that we would request to look at is whether or not the evidence is that he can perform on work. He can continue his work. Oh, that he can perform these work-related duties. And there's nothing in the evidence that states that he can run, grapple with anyone, wrestle with a offender, to the terms that is needed as a police officer. With that, we would ask that you would find, affirm the circuit court's decision and award or continue to award Mr. Anderson a line of duties.  Thank you, counsel. Mr. Goodwell-Levone? Maybe you could start off by distinguishing Wade, if you can. Counsel argues that this case is on all fours with Wade. It's not on all fours with Wade, Your Honor. So in Wade, Dr. Milgram was found by the Supreme Court to have selectively disregarded, misstated, or ignored evidence that was in the record. He said that this has to be a new injury not related to an act of duty because the plaintiff never reported a pop sound to her doctor, which was clearly inconsistent with the record. There was evidence in the record where the plaintiff had reported a pop. So Dr. Milgram simply ignored that or didn't see it. Didn't your client in this case ignore a lot, kind of expressing the same doubts and prior skepticism of the board with respect to the initial finding? I mean, he basically came out and said, I mean, you said it before because I think one of my colleagues had asked you, nobody is denying that he initially had a disability. And you said, no, no one's denying that. But that's not true. Dr. Freeman, everywhere you turn, was showing skepticism of this initial injury, really harping on the fact that it was preexisting, et cetera, et cetera. So it's no different than Wade, is it? I think it's very different from Wade. I respectfully disagree with – I mean, his opinion, he kept reinforcing that he never thought that he had really been injured in the line of duty initially. I disagree with that. I think that the doctor may have been confused with the differentiation between a preexisting condition and exacerbation of a preexisting condition. Certainly, if an act of duty exacerbates a preexisting condition, it's a line of duty disability pension. The doctor may not have understood that. But the doctor certainly testified that he accepted as fact that the plaintiff had been rendered disabled and was disabled based on left knee pathology in 2006. He ultimately rendered an opinion, though, that the plaintiff had ultimately recovered from that disability. And unlike Dr. Milgram and Wade, he didn't misstate any evidence. He read everything. He read the job description. So to say there's no evidence that the plaintiff could perform the duties of a police officer in Libertyville, we provided the job description to Dr. Primus to review. And Dr. Primus said yes. I also assume that Dr. Primus gave conflicting opinions regarding whether the plaintiff could return without restriction. I disagree with that. I don't think that Dr. Primus equivocates at all with respect to whether the plaintiff has recovered from his disability and can return to his job as a police officer. I think he was unequivocally clear about that. And to suggest that there is some equivocation there, number one, there has to be equivocation. I don't think that there is. I think that what the plaintiff is actually asking the court to do is to reweigh the evidence and to respectfully, if it disagrees with the board's decision, substitute its judgment for that of the pension board. And that's specifically what the reviewing court is not supposed to do on administrative review. If Dr. Primus had been like Dr. Milgram, the pension board would have an issue in this case. I understand that. But we don't have a Dr. Milgram situation here. So I hope that that answers the court's question. I would also say that Dr. Milgram conjectured as to whether somebody was disabled or not disabled and said, well, I just think this person does not have a motivation to work anymore as a police officer. And that's pure conjecture. There's no conjecture by Dr. Primus here. He performed an extensive physical examination. He performed numerous provocative maneuvers. He took x-rays. He reviewed all of the records. And he issued his report. He did exactly what a doctor is supposed to do. I understand that the plaintiff disagrees with Dr. Primus' opinion, but that's not the standard enunciated for the administrative review law or by the Illinois Supreme Court. Real quick, in terms of a knee replacement, I think the plaintiff argued that all the doctors have concluded that the plaintiff needs a knee replacement. I don't know that she said all the doctors. I thought she said CHAMS had concluded that. Then I misunderstood it because that's correct. Dr. Primus unequivocally opined that he does not feel that the plaintiff needs a knee replacement. He said, why would I recommend a knee replacement for somebody who presented and examined for me the way that the plaintiff did? So simply having that arthritis in the knee in and of itself does not necessitate a knee replacement. It's when the pain becomes so severe and the range of motion, the lack of range of motion becomes so severe the person can't function anymore. And there's certainly evidence in the record to suggest that there was no debilitating pain anymore, that the range of motion was very functional. And so there's plenty of evidence to support the board's decision. You're saying to me, and I'm just a little confused because I see different things, you're telling me that Dr. Primus never doubted whether the condition resulted from injury suffered in the line of duty. You're saying he never doubted it. I think that he doubted it, but I think that he doubted it because he misunderstood that a line of duty disability pension can be based on the exacerbation of a preexisting condition. Because without question there was a preexisting condition here and active duty exacerbated that. And so that may have been where Dr. Primus was hung up. But the issue of causation is not the issue on an annual examination. The issue is whether the person has recovered from disability, and that's it. And we have evidence that he did recover from disability. We would respectfully ask your honors to reverse the trial court and to affirm the pension board's decisions. Thank you very much for your time. Thank you. The court would thank both attorneys for their arguments here today. And the case will be taken under advisement.